Good morning. Tom Buchel on behalf of the Blue Mountains Biodiversity Project. I'm joined by my co-counsel, Austin Starnes, at a council table. Almost all the issues on appeal involve the Forest Service's failure to properly or fully consider the cumulative impacts of the Camp Lyft project and the multiple other similar logging projects that it has recently approved across the entire Malheur National Forest. This consideration of cumulative impacts is required by both the NEPA and NIFMA. Projects across the entire forest are relevant because the resources at issue here and that are impacted by these projects, wildlife habitat provided by large trees and aquatic habitat for threatened steelhead and red-banded trout, exist across the entire forest. And the Camp Lyft project and multiple additional projects recently approved within the Malheur have admitted adverse impacts on both large tree habitat and the aquatic habitat for steelhead and red-banded trout. Mr. Buchel, before you dig further into the details here, could you tell us how big the Malheur National Forest is? I think it's about 1.7 million acres. That's correct. I'm trying to figure out where the district judge and the Forest Service brief came up with 170 million acres – 100 times that size. Your Honor, someone brought that up during one of the moots, and I hadn't recognized that mistake. But, yeah, the forest is about 1.7 million acres. I'm curious as to how such a mistake gets into the record. But perhaps counsel for the Forest Service can address that. I think the EA and the planning documents are pretty clear about the size of the forest. The Forest Service personnel got the size right. Right. But it's a little disconcerting to see that in the district court decision and the briefs. The Service appears to believe – oh, to finish my thought, the Service's analysis in the NEBA documents never considers in any meaningful way the cumulative impacts of all these logging projects on these resources. The Service appears to believe that impacts are only cumulative if the impacts can directly combine to create a larger impact. For example, sediment from a timber sale within a watershed that flows downstream and combines to create a larger cumulative impact. And for the Camp Lick Project, the Service claims the sediment added to the streams in the Camp Lick Project will not flow outside of the project area, therefore, no cumulative impact. Similarly, only cutting trees in the project area, so no cumulative impact on wildlife habitat provided by trees outside the project area. But cumulative impacts can occur both when direct impacts from multiple actions physically combine and when those impacts accumulate over a short period of time and together have a – So I understand what – oh, no, go ahead. No, I was just going to ask what here is your strongest case for the notion that the Forest Service needed to look at these cumulative impacts at the forest scale. I think you pointed to Dombeck, but I'm not sure Dombeck holds that. I think Dombeck is the strongest case, Your Honor. Dombeck clearly says that, especially when we're talking about the plan amendments, when you're amending a provision that's at the forest scale, you need to look at the amendments forest-wide because they will have an additive impact. I think that's exact language from the holding of the decision. So I think I understand your argument, and I think it makes sense, but I'm just – I'm struggling with how it fits here. So let me see. So I think what you're saying is there's several ways you could have cumulative impacts. One would be that, you know, this project is going to create 10 percent. I'm making these numbers up, and they're probably not how the scientists say it. But this is going to create 10 percent. It's going to muddy the water 10 percent. And over on this other drainage, it's going to muddy the water 10 percent. And it's going to muddy the water over on this project over here. So a different project. And when you add it all up, when they all come together, it's going to muddy the water 30 percent. I'm sure, again, that's not – so that's one way you could have cumulative impact. And I think the Forest Service argument that, you know, these drainages don't connect here, and so that's not – the other way, though, and I think your point is, is they don't necessarily have to accumulate that way. In theory, you could have something that's going to kill 5 percent of the fish, right? And then over here, it's going to kill 5 percent of the fish and kill 5 percent of the fish. And when you add it all up, it's going to kill a lot of fish. So I think you're – I understand your point that cumulative impacts have to be looked at different ways, at least those two different ways. But as I understood the Forest Service's argument here, and this is what I want your response to, is that they were saying there is some adverse impact in the sense of, you know, there's something that is worse for fish. But they weren't really saying it was going to kill any fish or anything like that. And so it's going to kill – and since they don't come together in the first way, and they don't kill any fish, then you don't – then there's nothing to sum together. And so I understand that you could have a cumulative impact along the way you're saying, but if their conclusion in any given project or subproject, whatever you want to call it, is that, yes, there's some adverse impact, but not enough to actually rise to the level that it would sum with anything else, then it's not a problem because there's nothing to sum together. You could have that kind of adverse impact but didn't – but was not a problem under your second way that you're saying. Even assuming that – and I agree with you that the second way is a valid way to look at cumulative impact. I understand your question, Your Honor. The problem for the Forest Service is their NEPA documents actually don't say that. All we did, our clients did when we commented on these timber sales, was we looked at the various NEPA documents for all these different sales, and the documents are very straightforward. They're simple paragraphs where they say, for this timber sale, that there's an impact to, for example, Camp Lick, 8.4 percent of a steelhead habitat. And then they say, and that impact is insignificant at the forest level. They don't say it's insignificant for the Camp Lick project area. And our point is, when you're claiming insignificance at the forest level, you need to look at all the projects at the forest level. And so what my clients did was they said, look, you've also got the Ragged Ruby project, and you've got the Big Mosquito project, and you've got the Rattlesnake project, and you need to add those together. Or at least acknowledge and explain why you're not adding them together. And they never did that. They simply did not respond. So you're saying they didn't address it. But it is possible that something could be insignificant at the forest level, even though it has some adverse impact. It's just not really affecting, you know, like no fish are dying from it or something. And since those fish are isolated from these other fish, that they wouldn't accumulate that way. Is that at least theoretically possible? I think it's theoretically possible. But, again, the EHA doesn't contain that analysis. So your point is that they need to have explained it. Explained it. Because they simply say adverse impacts. And there can be impacts to fish beyond killing them. Which I guess takes us to back up the 30,000-foot view. I understand NEPA is – you know, NEPA doesn't provide any substantive relief. And so it is only a procedural thing. But, I mean, at the end of the day, these projects are designed to try to help the forest long-term. And I'm trying to figure out, like, do you think that these projects are actually going to cause damage? Or is it just that you don't want them to happen? I'm trying to figure out, like, why you would be wanting to stop these projects that are designed to help the project – the forest long-term. The EA admits that there will be sediment added for up to 10 years, I believe is the number they use. It admits that shade will be decreased. Water temperature is critical for seal head for a period of at least 10 years. So there are adverse impacts that they admit. Fish can't hold their breath. So those 10 years are pretty critical. And you could lose a lot of fish. So you do think – I mean, the idea here, obviously, is that you've got to break an egg to make an omelet. We're trying to make things better. But to make things better, we have to go in there and actually do these things. And doing those things is disruptive to some extent. We're going to try to minimize. That seems to be whether – and I'm trying to figure out – and the Forest Service is acknowledging that, but saying that limited-time disruption is not that great, and over time, it'll be actually a net benefit. Are you disagreeing with the fact that, A, it'll be a net benefit, and then, B, do you think that the short-term disruption is so great that it outweighs the long-term net benefit? What I would like to see is an analysis that actually considers that. And I don't think they did that. So you're just not sure? We're not sure, although we do disagree that the idea that you have to – by cutting down trees, large trees, you're actually going to somehow increase shade, that doesn't make any sense to us, and it really isn't explained. That is what they argue, that somehow this is going to actually increase shade in the long term. But we don't think you increase shade by removing large trees, which is what they're doing. I mean, the Forest Service scientists, you agree that they – do you think this is just a logging project disguised as a supposedly helpful-to-the-forest thing, or is that what you think? That is what my clients believe, Your Honor, and you said scientists. They don't cite any science for that. They just say we think that this is going to increase shade over time. There's no science cited for that. What we like, what we want here under NEPA is just an acknowledgement of these cumulative additive impacts and explain to us why, if you're claiming insignificance at the forest level, when you add all these things together, I think the number is 29 percent of steelhead habitat in the forest. It's much harder to dismiss that as insignificant at the forest level. And again, they didn't even consider it. I think the service ultimately admits that we're right and that this analysis was necessary because, as I said, they basically ignored my clients' comments for the most part until the final decision notice came out. And that was – there had been a draft decision notice. We objected to that. The final decision notice suddenly and for the first time has a chart that actually compares the cumulative impacts of two of the sales, the Big Mosquito and Camp Lick. That just suddenly appears with, you know, no explanation why this is suddenly relevant after we've been asking for this. It's not in the EA, which is where it belongs, that kind of an analysis. My clients had no opportunity to comment on this analysis. It cites acreages and impacts that don't cite to the EA, and we don't know where these numbers come from. And it's also incomplete because it only has the two sales. It doesn't have Ragged Ruby, which had happened in 2019, a year before the decision notice came out. It doesn't have the Rattlesnake sale, which also had come out. So it's even an incomplete analysis. But I think what's relevant is it's an admission that this combined additive effect is relevant and they need to talk about that. And it just suddenly springs out of nowhere in the decision notice, even though my clients had been asking them to do this analysis since the comment period for the original draft EA. And I think that's an admission that this was necessary and it should have been in a supplemental EA. That's what they should have done at that point if they decided this was, in fact, relevant. So my clients could comment on it and could say, for example, where do these numbers come from of mileage? Because these aren't the same numbers that are in the EA. And explain that to us. But that never happened. It just suddenly appears. So I think on the aquatic habitat point, the decision notice essentially acknowledges that we're right and that they should have done this. But it needed to be done in a NEPA document that was subject to public comment, which the final decision notice was not a NEPA document. It's like that. So, Your Honor, moving on to the second big cumulative impacts issue, which is wildlife habitat that's impacted by large tree logging. And these are the wildlife that requires large trees. All the forest plans in eastern Oregon were amended in 1994 by the east side screens because the service acknowledged that there was a real problem on the forest. This was actually a really wise move by the Forest Service. It was done at about the same time as the spotted owl litigation that was going on in the western part of the state. And the Forest Service realized that we actually have a potential spotted owl problem in eastern Oregon with the critters that need the large trees. And so we're going to take proactive action and we're going to amend all the plans and we're going to say you cannot log trees over 21 inches because we don't have enough of those right now. And if we continue logging those trees, we're going to have endangered species as opposed to just species that are on the edge of being endangered. So the plans were all amended. Then the Forest Service started using site-specific amendments to change these provisions. And they've done a series of these amendments in the mouth year. And the issue here is under DOMBEC that when you amend a forest-wide standard, and there's no question that east side screens are a forest-wide standard, you have to look at the cumulative impacts of all the times that you've amended the standard and foreseeable times that you've amended the standard. And the Forest Service actually has a section in the EA where they list the various amendments. But what's remarkable about that section in the EA is it doesn't even mention the word wildlife, even though the screens were a wildlife protection standard. And what's missing is any analysis of what logging all these large trees and they're targeting grand fir is going to do to a forest that already doesn't have enough large trees. And so the analysis for wildlife habitat is really critical. And they don't even talk about that in the section about the amendments. And DOMBEC clearly required that. And so we think that also is a cumulative impacts violation. And the problem that the east side screens identified in 1994 still exists. There's a guidance document from the Forest Service Regional Forester that came out in 2015 that's in the record. And it talks about how there still are not enough legacy trees, including specifically hollow, large grand fir on the landscape. And the guidance document told the Forest Service it's still important to recruit and retain large, old trees on the east side of the region, which includes the Mallier National Forest. So the Forest Service knew this in 2015, that this was important. And yet they're targeting grand fir and taking out large trees. So at a minimum, there needed to be an analysis of what the impacts on wildlife habitat were going to be when you're taking out large trees from a forest that already doesn't have enough large trees. And that just never happens in the EA. And then finally, I want to come to our NFMA claim. NEPA clearly requires cumulative impacts analysis. NFMA does too, and it's part of the National Forest Management Act's requirement for integrated forest plants. When the National Forest Management Act was passed, it added these, for the first time it required that each forest had to actually have a plan that set out, this is how, this has set out the things that we're going to do in this forest over the next 15 years. And the NEPA document supporting that plan would then now analyze the impacts of doing everything that the plan said. So integrated forest planning is an essential requirement of NFMA. And when done properly, it will look at all the impacts of what you're going to do. So if you have a provision that says don't log large trees, the EIS is going to say the impacts to wildlife are this because we're not going to log large trees. Similarly, if you decide to log large trees and you say we're going to log large trees in these areas of the forest, the EIS for the plan is going to say and this is the impact of doing that. But what the Forest Service has been doing is doing site-specific amendments that allow for the logging of trees, large trees just in specific project areas. There's no question that NFMA allows plans to be amended in any manner whatsoever. Very broad language. We acknowledge that. I just want to make sure, you said you wanted to reserve a few minutes and you're getting into that. Yeah, just quickly just to wrap up, Judge Hernandez in a prior case, Snow Basin, and that's really the issue in this case, whether Judge Hernandez is right, said despite that language about amending plans in any manner whatsoever, it still has to be rational. It has to be consistent with integrated planning. And what he said was you have to point, the Forest Service has to point to some unique characteristics to justify the decision, and it's a decision they make between a site-specific amendment versus an amendment to the whole plan. And here the amendment issue is only for the plan, excuse me, only for the project area, even though they've been amending the plan repeatedly in other sites showing that the problem they're addressing is actually forest-wide and really should have been subject to a forest-wide amendment that would have been subject to an actual analysis of the ramifications of logging large trees in all the areas where these forest health conditions supposedly exist. And I'd like to reserve the rest of my time for rebuttal. Could I just very briefly ask you about the status of amendments to the forest plans as a whole, which I gather is the subject of separate litigation? Yes, the Forest Service, and we only bring this up because the Forest Service briefs seem to suggest that it wouldn't be feasible to do a forest-wide amendment, and they actually tried to do one in 2021. My question really is, is there a reasonable prospect that this dispute becomes moot based on the forest-wide amendments? If they ever did a proper forest-wide amendment and it survived judicial scrutiny, which the one they did, did not. The district court struck that down and they decided not to appeal. That was Judge Aiken's recent decision? Yes, and they did not appeal. All right, thank you. Good morning, Your Honors, and may it please the Court to mower around tree for the Forest Service. And I apologize. Is this sounding right? It's echoing in my ear. I apologize for the figure of 170 million acres. It is not. It is 1.7 million acres. I apologize for that. To Judge Van Dyke's point, the purpose of this project was indeed to increase the health, the resiliency, and the resistance of the Forest Service. All of the actions that are to be taken are for that purpose. And there are a couple of things I want to address, but I'll veer into kind of bleeding into that concept of this being a project to help the forest. Notwithstanding plaintiffs' arguments of there being untoward motives, if you will, when the Forest Service conducts these projects, the Forest Service is charged with managing all of the many objectives that are set forth in any given forest plan. And when the Service finds, as it did in this case, that there are significant problems and that there are areas of the forest that are not meeting the forest-wide objectives, the Service will generally have to determine what to do as a consequence of that. And it looks at, for example, the conditions that aren't being met, the conditions that are causing the problems. It'll look at what actions are required to address those problems. Can you address the specific argument that for each of these projects, if this is the cumulative impacts argument, for each of these projects, so specifically I think for the aquatic, the impact on aquatic habitat, that it was found that they were not significant at the forest-wide level, and then their argument is, but you never went through and sort of, I think they just sum up the numbers and say, well, now we're talking about a third if you just do that. I'm not sure, is that not the right way to look at it? Or what about the argument that you didn't, that merely finding that each individual project was not significant at the forest-wide level doesn't tell us whether or not cumulatively they might be significant at the forest-wide level? There are a couple of things to address here, one of which is with respect to aquatic habitat. The watershed at issue is an important component, and for the resource that we're looking at, which is particular fish, for example, steelhead or red band trout, you look at where they actually swim, where they live. So in this case, it was decided that the watershed, which is about 40,000 acres, is the relevant spatial scale to look at cumulative impacts, and that's because you're looking at water that drains into a particular area, drains out of, and therefore what environment actually impacts these fish. When plaintiff's point, I think, is that if this is the size of the forest, we have impacts here, though separate because they're in a different watershed. We have impacts here, and we have impacts here. The experts here at the Forest Service say, well, there is no connection of the fish here and the fish there. So the cumulative impact isn't significant because we have impacts. Well, I think to try to use the example, to try to modify my example I was using earlier, if you say, well, we're going to do this little project, and it's going to kill all the fish in 1%, you know, it's going to kill 1% of the fish, say, because, and we have to do this project. It's a really important project, and I could, you know, but it's only going to be 1% of the fish in the whole forest, so it's not significant at the forest-wide level. You could say that. But then if you had 50 of those projects that were each going to kill 1%, now you're going to, suddenly you're going to kill 50% of the fish, and so when you accumulate them, they are significant. And that's sort of, I think, simplistically their argument is that merely finding, you did find that there's going to be some adverse impact in this drainage over here, but it's not significant at the forest-wide level, and there's going to be some impact in this drainage and some in this drainage, and we don't need to accumulate those because of, but their argument is, yeah, but when you add them all together, it might be, you know, you could, in theory, you could end up with a whole forest that way. And I'm trying to figure out what the answer to that, it occurs to me that it may, are we not talking about a situation where you're killing any fish or something, and so is that why it doesn't make sense to sort of add them together the way you would if you were, I'm just trying to figure out what your answer to their, you didn't sum them all together. The approach requested suggests that in all instances, every time the Forest Service takes on a project, it's required to look forest-wide. And it's only when you look at this case, for example, through that lens, that you worry about the entire 1.7 million acres of the forest. That really can hamstring the Forest Service if each time it takes a look at a particular area, it has to stop and say, yes, we see serious deteriorating circumstances here. Yes, we know that 20 of the forest plan objectives are not being met, but we now have to look at the entire forest to figure out what the entire forest impact is. That can't be taken on on a site-specific level every time the forest does a project, because, indeed, you would see the expenditure of resources and time. That makes some sense. And I think you have a good argument that the statute leaves the Forest Service a lot of discretion in figuring out the geographic scope. But what do you say to their argument that, yeah, but if you let the Forest Service do this, they could do death by a thousand cuts. They could effectively do all these things and use the argument you're making and never take into account that when you actually do accumulate them at the forest-wide level, you're killing half the fish or something. Well, I offer as an example the Ragged Ruby project, which was a project that the Forest Service didn't include in, for example, its EA because a final decision had never been rendered. But when the Forest Service ultimately did the analysis, and it was an EIS for Ragged Ruby, it looked at the other projects, all of the larger or farther away, if you will, projects that plaintiffs here say should have been looked into in the EA here. And the point being, when you have either a final decision, so all of the activities that are going to be conducted are finally determined, when you have interaction between, for example, water bodies, and you don't have separate watersheds that don't intermingle, when it's appropriate and when the resource that you look at requires it, the Forest Service does look at a bigger picture. It doesn't always look forest-wide, and as I suggest, or as I say, that is an impossible task for the Forest Service to do all the time. But when the experts deem that the resource that you're looking at requires that you look at a larger scale, the Forest Service does. And I'll offer an example. A salamander, you don't look 80 miles beyond the home range of a salamander when you're trying to determine impacts to that particular species. So cumulative impacts, the reason the agencies and the Forest Service, for example, get discretion is because they determine things like what's the proper home range, where do we need to be looking, and do we need to look forest-wide? One point I'd like to make, and I'd like for the Court to understand this, and it's about the amendments. It was the point I was trying to get at. When the Forest Service looks at a project area and sees that it's not meeting forest objectives, one of the things that it also looks at is once it determines what actions need to be taken, the Forest looks and says, do any of these required actions at this particular site, and I'm talking now about forest amendments. When the Forest looks at an action and says, okay, these are the actions that we need to take to take care of the 20 ways in which this site is not meeting the forest plan objectives, the Forest might – the Forest Service might find out that some of those objectives, those actions that are required, will conflict with a forest plan standard. Now, this isn't – it may sound awful, but it isn't terribly surprising or unusual. And that's because forest plan provisions, forest plan standards, apply forest-wide. They're broad in scope usually, and they have broad application. And they can't possibly account for every inch or every acre of the forest. So there will be times when a forest plan standard or provision will conflict with the actions that are required to bring an area into compliance in terms of all of other objectives, for example, fire regimes, those sorts of things. And to your point, Judge Van Dyke, Congress noted in many ways that there will be this dissonance between forest plans – forest standards and actions that are taken on a smaller scale because Congress allowed for the Forest Service to amend forest plans. That's in part the reason why you have to do it. The forest plans provisions are so broad that they can't always be consistent what's needed – consistent with what's needed at a smaller scale. One of the – one of the other points I wanted to make is plaintiffs complain about – I believe it's the matter in which the EA is set out. I think what they'd like to see is neat kind of magic sentences that say, given these 100 pages of data that we've provided in this NEPA document, we've determined X. And very often, the EAs, for example, or the NEPA document, won't have that nice, neat, tidy sentence. But what's important for the Court to note is that all of the information that's provided, whether it's in a table, whether it's in sentences that appear to be conclusory, but their data and its information that the Forest Service is setting out, that it ultimately looks at and says, given all of this that we've found, we, for example, decide that a site-specific amendment is necessary as opposed to a forest-wide amendment. And the point I'm trying to make is, in many ways, these NEPA documents are almost like ingredients for a meal. And when you look at them separately, it looks like you just have salt. And salt isn't particularly relevant and doesn't answer my questions, plaintiffs might say. But when you put it all together, your final sentence is, this is the dish that we've created. And the dish, if you will, is the Forest Service's final determination that's been based on all of the information that it's laid forth and all of the – in the NEPA document. One more thing I'd like to – – Ms. Roundtree? – Yes. – Excuse me. Before you go on to your next point, I guess one of the questions that I have here concerns this notion of improving and restoring historical variety within the woods, which sounds great. Do we have – or does the Forest Service indicate in its documents how long it's going to take to gauge success for this effort? – Success? – I mean, it sounds like an experiment, right? A site-specific experiment. – It is not. But success – I'm just trying to deem what plaintiffs might determine to be success versus the Forest Service. – What would the Forest Service – – So the Forest Service, as I said, the point is that there are many ways in which this area is not – compliance isn't correct – isn't meeting the objectives of the Forest Plan. One of which, for example, is the fire regime is such that there are more uncharacteristic and high-intensity fires. It's that the old ponderosa pine and the western larch, which are the important old-growth species, are suffering because of the presence of the Grand Fir and Douglas fir trees. Their overall abundance, in many ways, they are largely and greatly impacting the old – the ponderosa and western larch. So success here, for example – and that's why this is site-specific – success here is because we are having huge impacts from – as a result of the overabundance of the firs – the Grand and Douglas firs. So success here is to get rid of those trees that are having the greatest impact to the old ponderosa and to the western larch and ensure that we can maintain their survival of the old ponderosa and western larch and make sure we – and it can ensure their endurance because they're more fire-resistant. I understand the objective. I'm just trying to get a sense of … The timing. … the timing. And to be frank, the rationale for this project is, in essence, mankind in general, and the Forest Service in particular, messed up for a while in excessive fire suppression. And that's why we have this intrusion on the ponderosa pine and the western larch, right? Not necessarily. No, the – there's – fire suppression has contributed in part … And logging practices, right? I don't recall that being the case for the circumstances here. But that might be the case. But where we are now is this – that we have an overabundance of a species that is taking over a species that we are trying to preserve. I understand. Okay. So I get that. But clearly, this is some kind of corrective measure, right? Because when this forest was left untouched for hundreds of years, ponderosa pine and western larch old growth dominated, right? Yes. So what I was expecting somewhere – and I haven't seen it in the documents – is some kind of notion of humility that this is something, you know, of an experiment. And we aren't – what we thought was a good practice 100 years ago turned out not to be such a good thing. And let's try things on a site-specific basis rather than forest-wide. No, that's not the case. That's not the way to think about it. No, no. So with respect to the success question that you asked, as I think about it more, success in terms of saving or helping to preserve the old ponderosa and western larch can be accomplished immediately. The minute we get rid of the culprit, which is the ground firs and the Douglas firs, we then have the old ponderosa and western larch that can continue to thrive. We have – and it states in our brief and in the record, there are over 100 units that are slated for harvesting in the Warm Dry Plant Association group, the particular area of concern here. In 100 units, it was determined that the overabundance of Douglas and ground firs is such that if they are not removed, the old ponderosa pine and western larch that are being affected will not survive. So this is a question of – I won't – urgency when you're talking long periods of time, but this is a serious condition that needs to be corrected. And so if we leave the ground firs and the Douglas firs, simply because they're large trees, we almost, in essence, sacrifice the trees we're after. These fir trees are young. They're relatively young, and they're growing fine. That's why they're so abundant in this area. They're shade-tolerant, and they're, if you will, inundating the old ponderosa and the western larch. So we need to eliminate some of them so that the trees we're most concerned about can survive. So did I get to the essence of what you were after? I think so. But I'm – if there were an experiment, it would probably be on the scale of 100 years, right? So your question, I think, is, if I planted a seed, when is an old-growth tree going to grow? When are we going to have old-growth ponderosa pine and large forests restored? Well, this is part of the process. In order – you have to stop killing them first or helping them die. Okay. And by having the firs there, they are – they're taking the nutrients. They're taking the water. They're taking the sunlight because they are shade-tolerant. They're growing to multi-layers. All of their environment is contrary to what's conducive to the growth of the old ponderosa pine and the western larch. One of the – I'd just like the Court to bear this in mind in terms of plaintiff's insistence that the forests do things on a forest-wide basis. And I'd just like to play things out just a bit so the Court can get a sense of what that might look like. I spoke to this a bit before. There would be a substantial expenditure of resources and time. And this is just something that the Forest Service simply doesn't have, not just in terms of money and employees, but it doesn't have time in terms of the conditions that exist on the forests that are deteriorating as it looks forest-wide simply to see if it can find out if there are other similar problems going on. There's an introduction. The more you do something on a larger scale, there's an introduction of greater uncertainty. And when you're addressing the entire forest, as I said earlier, I believe I said the forest-wide actions cannot account for each and every acre of the forest. So when you do this broad brush approach, there's more uncertainty that you introduce into the process. And finally, such an approach of doing everything on a forest-wide, for example, if you do always do or if, as plaintiffs say, if NFMA had a preference for always doing forest-wide amendments, that would mean over a period of time that the forest plan would start looking a lot different than it does now if you're always doing forest-wide amendments. And that's something that undoubtedly would prompt a legal challenge by these plaintiffs or other plaintiffs. And so we believe that, in short, the approach that the Forest Service is taking now, which is a sensitive approach to what's going on in the immediate circumstances and directly affecting the resources of concern, is the reasonable approach. Thank you, Counsel. If I could ask one other question, Counsel. If we were to think that the cumulative impacts on the so-called PCE or primary cavity excavators' habitats had not been considered sufficiently on a forest-wide basis, what effect would that kind of a remand have, do you think? I'm sorry, what effect would that? Would that kind of a remand have? Hmm. Because it sounds like what you're saying is, look, we've got to get rid of a lot of the PCE habitat here with these large trees for the greater good of the ponderosa pine and western larch. Well, there's been no indication that those species would be – and I'm not sure of the scale you're speaking of. Within the … Forest-wide scale. Well, again, the question becomes, number one, to what degree is that sort of requirement usurping the discretion of the agency and its experts in determining, for example, things like the home range of these PCE? I mean, do we need to look forest-wide? But I think you're asking what would the consequence be on – if a remand were to require a forest-wide analysis. Well, again, it means Camp Lick and all of the concerns there, those deteriorating conditions just have to sit, and then something would have to be taken on a much larger scale. Is this project not – is it just waiting? I'm sorry? Is the project waiting right now? Has it not happened yet? No, it's in – it hasn't been – it's in process. Okay. And when will it start, assuming it's not stopped by a court? I'm sorry. I do not know. I can provide you supplemental. I do not know. No, that's fine. All right. All right, well, thank you very much. Appreciate it. I think we have a few minutes left for you. I'd like to start first with we heard a reference to the Ragged Ruby EIS and that the Ragged Ruby EIS had somehow addressed this, and the district court also cited this document, and opposing counsel suggested that the Ragged Ruby EIS did look at other projects and thought that that was appropriate. There's a single sentence in the Ragged Ruby EIS, and it's at – this is at 5 ER 935. And it simply says, the Austin project, one of the projects that we want them to look at, is a watershed restoration project which would be on a similar scale and include similar types of actions as Big Mosquito, Magone, and Camp Lick projects. The effects to aquatic habitat and species would likewise be similar. That's not a cumulative impacts analysis. That's an acknowledgment that a cumulative impacts analysis is necessary. And they didn't do it. Again, we heard the opposing counsel repeatedly say this would be incredibly burdensome. It wasn't very burdensome for my clients. They just went and looked at these EIS documents, found the pages where they said there's going to be this much habitat impacted, and added it together. And the government dismisses in their briefs, they say that's simplistic. Fine, explain to us why that's not right. And they didn't do that. And, in fact, the decision notice, in fact, has that analysis. And finally, I just want to address Judge Hamilton's point that if this really were an experiment and they were just doing this in one site to try to figure out if this would work, that would be a proper site-specific amendment. And they could do that. The problem here is this is an experiment that they've repeated in the Malheur National Forest a dozen times. And it's an experiment that they were doing in the Snow Basin case, in the Wallowa-Whitman National Forest. So they keep doing this. And that's not an experiment. And that's something that is not site-specific. They need to do a plan amendment to evaluate all of this. And, as we've said, that's feasible. They tried to do it in 2021. It got thrown out because they didn't do an EIS for it and because they tried to skip the objection process. We would like to see, if they really are going to do this throughout the region, do a plan amendment to evaluate the impacts of this on big tree habitat. Thank you. And plaintiffs request that you reverse the district court and remand. Thank you. Thank you, counsel. Thank you to counsel for both sides. And that concludes all of our cases for today. The court will be adjourned until Thursday. All rise. The court stands adjourned until Thursday morning.
judges: Hamilton, VANDYKE, THOMAS